

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-23-2004

# Coraggioso v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-1075

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Coraggioso v. Atty Gen USA" (2004). *2004 Decisions.* Paper 1042.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1042

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 23, 2004

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1075

SALVATORE CORAGGIOSO
Petitioner

v.

JOHN ASHCROFT, Attorney General of the United States,
Respondent

Petition for Review of an Order of
The Board of Immigration Appeals
(No. A77 035 208)

Argued October 28, 2003

Before: SCIRICA, *Chief Judge*, NYGAARD and
AMBRO, *Circuit Judges*

(Filed: January 23, 2004)

John D. Perez, Esquire (Argued)
41-51 Wilson Avenue
Newark, NJ 07105
*Attorney for Petitioner*

Robert D. McCallum, Jr.
  Assistant Attorney General
  Civil Division
Donald E. Keener
  Deputy Director
Michelle E. Gorden (Argued)
  Senior Litigation Counsel
Michael P. Lindemann, Esquire
John D. Williams, Esquire
Office of Immigration Litigation
Civil Division, Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

*Attorneys for Respondent*

## OPINION OF THE COURT

AMBRO, *Circuit Judge*:

Salvatore Coraggioso was born in Italy and entered the United States with his parents in 1984 at the age of four. Since then he has resided with his family in the United States, where he has been educated and employed. He has never been arrested. What reads like an immigrant's dream nonetheless is becoming a nightmare.

The hitch is that Coraggioso was not admitted formally to the United States. As a result, in 1999 he was served with notice of removal proceedings. He conceded that he was removable pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being properly admitted. Before the Immigration Judge ("IJ"), however, Coraggioso argued that removal proceedings should be terminated and relief be accorded under the Diversity Immigrant Visa Program ("DV Program") established by Congress. Concluding he was powerless to grant relief, the IJ issued an oral decision denying Coraggioso's motion to terminate removal proceedings and ordered him removed to Italy. In December 2002, the Board of Immigration Appeals ("BIA") affirmed the IJ's decision

without opinion. A timely appeal followed. We have jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996).

Application of the statutory language exacts an extreme hardship on Coraggioso and his family. But in the absence of a patent absurdity, we must interpret a statute according to its plain meaning. Here the statute, with perhaps unintended and lamentable consequences, is not absurd. Coraggioso's petition for review is therefore denied.

## I.

Congress instituted the DV Program in 1990. Each year this program provides visas to individuals from countries with historically low immigration admissions to the United States. *See generally* 8 U.S.C. § 1153(c).[1] A total of 55,000 visas are allotted to the program annually. 8 U.S.C. § 1151(e).[2] A diversity visa (an immigrant visa issued through the DV Program) qualifies an individual for permanent resident status. *See* 8 U.S.C. § 1255(a). If an alien qualifies to receive a visa under the program, that person's spouse and children under the age of twenty-one are entitled to visas as well. 8 U.S.C. § 1153(d).

A person seeking a visa through the DV Program files a petition with the State Department. In turn, it randomly selects the individuals who are eligible to participate in the Program. Such a person is considered a "lottery winner." Selection as a lottery winner, however, does not ensure that an applicant will receive a visa. The total number of lottery

---

1. The individual eligibility requirements for the DV Program and the procedures for allocating visas to specific regions are not relevant to this case.

2. Passed by Congress in 1997, the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. No. 105-100, 111 Stat. 2193 (1997) (codified as amended in scattered sections of 8 U.S.C.), stipulates that up to 5,000 of the 55,000 annually allotted diversity visas will be made available for use under the NACARA program. The reduction of visas to 50,000 began with the 2000 DV Program and remains in effect. It does not affect this case, the facts of which predate 2000.

winners exceeds the number of diversity visas available (approximately 100,000 winners for the 55,000 visas).[3] Thus, a lottery winner obtains only the right to apply to receive a visa through the DV Program.

Once an individual is selected to participate in the DV Program, s/he must submit numerous documents and undergo an extensive background review. Lottery winners from abroad submit applications at a United States consular office. Those residing in the United States, however, may apply to the INS for an adjustment of status under 8 U.S.C. § 1255(a). This procedure allows a lottery winner to receive a diversity visa without returning to his or her native country. A person is eligible for the DV Program for a single fiscal year only.[4] Those not receiving visas must, with sisyphean frustration, go back to the starting line and reapply to the lottery.

Coraggioso's parents were selected in the 1998 lottery and participated in the 1998 DV Program.[5] Coraggioso (then under twenty-one years old) was included in the diversity visa and adjustment of status applications submitted by his parents. He alleges his parents promptly submitted all required documents, paid all necessary fees, qualified for the diversity visas and were merely awaiting notification from the INS that their applications had been approved.[6] Sometime in January 1999, though, his parents received a letter stating their applications had been denied, not on their merits, but because the fiscal year had ended. In other words, the INS had not finished processing the

---

3. The excess number of petitions selected are "to ensure, to the extent possible, usage of all immigrant visas authorized." 22 C.F.R. § 42.33(c).

4. For example, fiscal year 1998 for the DV Program began October 1, 1997 and ended September 30, 1998.

5. The record fails to specify whose name in the lottery was drawn — Coraggioso's father, his mother or both of his parents jointly.

6. The record is devoid of any documentary evidence of Coraggioso's parents' participation in the 1998 DV Program. Any factual representations have been made by Coraggioso's counsel orally or in writing. The INS, however, has not challenged these factual allegations or presented any contrary evidence. For the purposes of this appeal, therefore, we accept these allegations as true.

applications by the end of the fiscal year. Sadly, diversity visas were available for Coraggioso and his family had the INS timely dealt with their application. Only 51,565 of the 55,000 diversity visas were actually issued for fiscal year 1998.

## II.

On appeal, Coraggioso argues that his removal proceedings should have been terminated due to the INS's failure to adjudicate his parents' adjustment of status application under the DV Program.[7] In addition, Coraggioso now requests that we order visa numbers be procured for him and his parents.

We review the decision of the IJ as adopted by the BIA. *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002) (citation omitted). Whether the IJ erred in interpreting the statutory provisions of the DV Program is a question of law subject to plenary review. *See Valansi v. Ashcroft*, 278 F.3d 203, 207 (3d Cir. 2002). However, the BIA's (and hence the IJ's) interpretation of the INA is subject to established principles of deference. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999). "[I]f the intent of Congress is clear . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

## III.

As the IJ correctly noted, Coraggioso's status cannot be adjusted in the absence of an approved visa petition or evidence that an immigrant visa is available. 8 U.S.C.

---

7. Coraggioso also appeals the BIA's affirmance of the IJ's decision without opinion. This issue is identical to the one decided in *Dia v. Ashcroft*, 2003 U.S. App. LEXIS 25901, 2003 WL 22998113, ___ F.3d ___ (3d Cir. Dec. 22, 2003) (*en banc*). As dictated by *Dia*, we must conclude the BIA's actions in this case were proper.

§ 1255(a). Thus the only issue we need decide is whether the DV Program allows the issuance of a diversity visa after the end of a given fiscal year. In other words, are Coraggioso and his parents still eligible to receive diversity visas after September 30, 1998 (the end of the 1998 fiscal year DV Program)? If so, we may grant relief. If not, relief is foreclosed.

In interpreting the scope of the DV Program, we must begin with the statutory language. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). According to long-standing principle, ambiguities are resolved in favor of aliens. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987). But where the statutory language provides a clear answer, our inquiry usually ends. *Hughes Aircraft Co.*, 525 U.S. at 438. The provision that dictates the result we reach today is 8 U.S.C. § 1154(a)(1)(I)(ii)(II). It states: "Aliens who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." *Id.* The phrase "only through the end of the specific year" unambiguously indicates Congress's intent to impose a time deadline on an applicant's eligibility to receive a visa. If Congress had used different language, our analysis may be been different. We are compelled, however, to interpret the statute as written.

Despite the clear mandate in 8 U.S.C. § 1154(a)(1)(I)(ii)(II), Coraggioso argues that we should still interpret the DV Program to grant the relief he requests. Congress chose to use affirmative language throughout § 1153(c). *See* 8 U.S.C. § 1153(c)(1) ("diversity immigrants shall be allotted visas"), (c)(1)(A) ("[t]he Attorney General shall determine"), (c)(1)(B)(i) ("[t]he Attorney General shall identify"), (c)(1)(B)(ii) ("[t]he Attorney General shall identify"), (c)(1)(C) ("[t]he Attorney General shall determine"), (c)(1)(D) ("[t]he Attorney General shall determine"), (c)(1)(E)(iv)("excess visa numbers shall be made available"). Hence the Attorney General and the INS have an affirmative duty to administer the DV Program in a timely manner. Further, § 1153(c)(1)(E)(iv) states:

> If the Secretary of State estimates that the number of immigrant visas to be issued to natives in any region for a fiscal year under this paragraph is less than the

> number of immigrant visas made available to such natives under this paragraph for the fiscal year, subject to clause (v), the *excess visa numbers shall be made available* to natives (other than natives of a high-admission state) of the other regions in proportion to the percentages otherwise specified in clauses (ii) and (iii).

(Emphasis added.) This language could be interpreted as providing a clear directive that the INS distribute all 55,000 diversity visas for a fiscal year. *See Nyaga v. Ashcroft*, 323 F.3d 906, 918 (11th Cir. 2003) (Barkett, J., dissenting). According to Coraggioso, these provisions of the DV Program conflict with the time limitation of 8 U.S.C. § 1154(a)(1)(I)(ii)(II), resulting in an absurdity. It is well recognized that even clear statutory language will not be given effect if to do so is absurd. *Cardoza-Fonesca*, 480 U.S. at 452 (Scalia, J., concurring).

Ultimately, however, we must heed the jurisprudential tenet not to create ambiguity in a statutory provision (and not to create a conflict between two sections of a statute) where none reasonably exists. The affirmative language used throughout 8 U.S.C. § 1153 creates a duty to administer the DV Program, but it does not extend the statutorily-limited period of eligibility for a diversity visa. *Nyaga*, 323 F.3d at 914. Also, we interpret § 1153(c)(1)(E)(iv) to mean that, time permitting, the INS must make available the excess visa numbers from one region to applicants from another region. But these provisions in 8 U.S.C. § 1153(c) in no way conflict with the requirement in 8 U.S.C. § 1154(a)(1)(I)(ii)(II) that all visas for a given year's DV Program must be issued by the end of that fiscal year. We therefore join the Seventh and Eleventh Circuits in concluding that, in the current circumstances, the language Congress used precludes the INS from issuing a visa pursuant to the DV Program for a given fiscal year upon the expiration of that fiscal year. *See Nyaga*, 323 F.3d at 914; *Iddir v. INS*, 301 F.3d 492, 501 (7th Cir. 2002).[8]

---

8. Had Coraggioso sought relief prior to the expiration of the 1998 fiscal year, our analysis may have been different. *See Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999). Similar to Coraggioso's parents, Paunescu

8

## IV.

We conclude with regret that Coraggioso's petition for review must be denied, thus affirming his order of removal. The equities of the situation clearly give us pause. Having lived in the United States since the age of four, Coraggioso is more truly an American than an Italian. He is neither a criminal nor a burden on society. In addition, it appears Coraggioso would have been entitled to a diversity visa (and, hence, permanent resident status) if the INS had performed its statutorily mandated duty and timely adjudicated his parents' DV Program applications. Now that he is over twenty-one years old, however, Coraggioso is no longer a "child" under the INA and cannot obtain relief through his parents. 8 U.S.C. § 1101(b)(1), (c). Therefore, it appears the only redress currently available is a private bill directing the INS to grant a visa number to him. *See, e.g.,* H.R. 4863, 107th Cong. (2002) ("For the relief of Rodney Allan Green and Wendy Sharon Green"); H.R. 4829, 107th Cong. (2002) ("For the relief of Olivera Goronja"). Absent

---

was a lottery winner for the fiscal year 1998 DV Program. But unlike Coraggioso's parents, Paunescu filed a complaint for mandamus and declaratory judgment against the INS on September 23, 1998. After a hearing on September 25, 1998, the District Court ordered the INS to "complete adjudication of the applications for adjustment status" for Paunescu and his wife without delay, or by no later than September 30, 1998. *Id.* at 898. Despite the court order, Paunescu's application was not adjudicated in time. In that instance, and despite the expiration of the fiscal year, the District Court ordered "defendants to process plaintiffs' applications and to grant plaintiffs all relief *to which they would have been entitled had defendants processed their applications in a timely fashion." Id.* at 903 (emphasis added). The Seventh Circuit has explicitly approved this result.

> It would be a different case had the district court ordered the INS to adjudicate the appellants' status *while* the INS maintained the statutory authority to issue the visas. In such a situation, the INS would be on notice to reserve visas and must complete the task, as ordered, before time expires. Allowing the INS to claim inability to issue visas at that point would impinge the authority of the court.

*Iddir*, 301 F.3d at 501 n.2 (discussing and citing *Paunescu*) (emphasis in original) (internal citations omitted).

such relief, Coraggioso will be forced to leave behind his family, friends and the only life he can remember.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*